### In re MARKAIR, INC., an Alaska corporation, Debtor.

AERFI Group plc, AERFI Jetprop Limited, AERFI Corporation, as assignee of Aerousa, Inc., and Air Tara Limited, Plaintiffs,

v.

William Barstow, Chapter 7 Trustee for MarkAir, Inc., Defendants.

Bankruptcy No. A95–00236–HAR.

Adversary No. A95–00236–013–HAR.

United States Bankruptcy Court, D. Alaska.

Sept. 24, 1999.

Spencer C. Sneed, Dorsey & Whitney, Anchorage, AK, for plaintiff.

Michael R. Mills, Bankston & McCollum, Anchorage, AK, for defendant.

John C. Siemers, Burr Pease & Kurtz, Anchorage, AK, for trustee.

## MEMORANDUM DECISION ON THE ANTECEDENT DEBT ISSUE [11 USC § 547(b)(2)]

HERBERT A. ROSS, Bankruptcy Judge.

| Subject | Page |
|---|---|
| 1. *INTRODUCTION* | 583 |
| 2. *FACTUAL AND PROCEDURAL BACKGROUND* | 583 |
| 3. *ISSUES* | 586 |
| 4. *LEGAL ANALYSIS* | 586–587 |
| 4.1. *Rent Payments Made and the Security Agreement Obtained Within 90 Days of Bankruptcy During the Preference Period Were Transfers for "Antecedent Debt" for the Purposes of § 547(b)(2)* | 586–587 |

| Subject | Page |
|---|---|
| 4.2. | Analysis of GPA's Authorities and History of Antecedent Debt Provision in Preference Law | 592–593 |
| 4.2.1. | The Pre–Code Cases Cited by GPA and In re Mindy's Do Not Hold Up | 593–594 |
| 4.2.2. | A Search for the Meaning of "Antecedent Debt" in the Preference Law Before 1978 | 598 |
| 4.2.3. | Cases Cited by GPA Regarding New York State Law About When Current Rent Debt Accrues and the Old Bankruptcy Cases Dealing With Provability Are Not Persuasive | 602 |
| 4.2.4. | The Fact That a Lease is Involved is Not Adequate Grounds to Hold That GPA's Security Agreement Was Not for Antecedent Debt | 603–604 |
| 4.2.5. | Analysis of Cases Cited by GPA Relating to § 547(b)(2) and Repealed § 547(c)(2)(B)) | 604 |
| 5. CONCLUSION: | 608 |

1. *INTRODUCTION*—GPA[1] collected substantial monthly rental and maintenance reserve payments from MarkAir under existing leases for the use of jet aircraft within 90 days before MarkAir filed bankruptcy. GPA also obtained a security interest on most of MarkAir's unencumbered assets to secure payment of past and future rent, maintenance reserves, and the performance of maintenance obligations.

The trustee seeks to recover the rent and maintenance reserve payments and avoid the security interest as preferential.

GPA argues that the monthly rent and maintenance reserve payments (or at least those which were made on time) were not preferential since they were for "current rent" which arose when the aircraft were used, and not for "antecedent debt."[2] GPA also contends that the unpaid rent and maintenance reserve payments for use of the aircraft which accrued after receiving the security agreement were not antecedent debt with respect to the security agreement.

The trustee maintains that both the payments and security interest were for antecedent debt, incurred when the lease was entered into, and that GPA should be required to prove its defenses under § 547(c).[3]

Were the payments and security interest for "antecedent debt?" Based on the expansive definition of "claim"[4] and "debt"[5] under the Bankruptcy Code, I conclude that they were.

In argument and briefing, GPA has implied that obligations beyond just periodic rent and maintenance reserves were covered by the security agreement, such as the costly obligation to return the aircraft in a maintained condition. These obligations are also antecedent debt for which the grant of the security interest was preferential.

2. *FACTUAL*[6] *AND PROCEDURAL BACKGROUND*—This *Memorandum* relates only to one leg of the eight distinct groups of summary and cross-summary judgment motions brought by the parties, each addressing certain aspects of preference law as they relate to the facts of this proceeding.[7]

---

1. Shorthand for plaintiffs and their predecessors.

2. 11 USC § 547(b)(2).

3. 11 USC § 547(c).

4. 11 USC § 101(5).

5. 11 USC § 101(12).

6. *See*, documentary evidence stipulated to by the parties, and the brief of GPA as follows for a fuller exposition of the facts: *First Evidentiary Stipulation Between Trustee and GPA*, Docket Entry 56, filed August 12, 1998; and, *Motion for Partial Summary Judgment Regarding Antecedent Indebtedness (GPA)*, Docket Entry 20, filed July 3, 1997, by GPA, at pages 1–6.

7. *See*, *Table Identifying Summary Judgment Briefing*, Docket Entry 179, filed August 27, 1999.

The present *Memorandum* deals only with the "antecedent debt" issue raised by GPA's motion for summary judgment[8] addressing whether GPA can "cut the trustee off at the pass" by showing that he can not establish the transfers were for "antecedent debt," part of the trustee's *prima facie* case. It does not address what exceptions to preference GPA might be able to establish under § 547(c) which are addressed in other motions.[9]

MarkAir had filed a prior chapter 11 bankruptcy in June 1992 (MarkAir I).[10] GPA provided substantial support to the MarkAir I debtor and facilitated confirmation of a plan. The reorganized debtor was not able to perform under its plan, however, and GPA put substantial pressure on MarkAir to catch up on delinquent rental obligations for a number of jet aircraft leased to MarkAir. In the course of negotiations, GPA was taken over by General Electric Capital Aviation Services, which had a much more aggressive collection policy.

As a condition to keeping a number of the aircraft, MarkAir was required in February 1995, within 90 days of the April 14, 1995, bankruptcy petition (MarkAir II), to sign a security agreement with GPA, secured by most of its unencumbered assets.[11] The security agreement covered the payment of past and future rental and maintenance reserves, and the performance of maintenance obligations and other conditions of the lease agreement. GPA also granted a deferral or forbearance in making some of the payments on the dates they were initially required under the leases.

During the 90 days before MarkAir filed a second bankruptcy petition (MarkAir II),[12] MarkAir paid GPA a number of lease and maintenance reserve payments called for by the original leases or the deferral agreement. A few were on the exact date they were due (either under the original leases, or the February 1995, deferral agreement), but most were at least a day or more late.

During the 90 days before the MarkAir II filing, MarkAir was desperately seeking refinancing and sought a further extension from GPA. It indicated to GPA that if it could not get the extension, it would file a second bankruptcy proceeding and seek to avoid the security agreement. No agreement could be reached and MarkAir filed a chapter 11 petition within 90 days of the perfection of GPA's security agreement.

The case converted to chapter 7, and the trustee sued GPA to recover the alleged preferential payments and avoid the security agreement. GPA filed a motion seeking summary judgment that:

> GPA Corporation moves this Court for partial summary judgment that its security interest in the property of MarkAir, Inc. is not subject to avoidance to the extent that it secures aircraft rents that accrued from the grant of the security interest until MarkAir's redelivery of GPA's aircraft.[13]

Although this statement only address the security interest to secure "rent," there were three antecedent debt issues addressed in the briefing and argument:

---

**8.** *Motion for Partial Summary Judgment Regarding Antecedent Indebtedness,* Docket Entry 20, filed July 3, 1997.

**9.** *See, Table Identifying Summary Judgment Briefing,* Docket Entry 179, filed August 27, 1999, Items D, E, F, G and H.

**10.** Case No. A92–00476–HAR, *MarkAir, Inc., an Alaska corporation,* Chapter 11 Bankruptcy Petition filed June 8, 1992 (MarkAir I).

**11.** *See,* Exhibit 1 to *Affidavit of Spencer Sneed,* attached to the *Motion for Partial Summary*

*Judgment Regarding Antecedent Indebtedness (GPA),* Docket Entry 20, filed July 3, 1997.

**12.** Case No. A95–00236–HAR, *MarkAir, Inc., an Alaska corporation,* Chapter 11 Bankruptcy Petition filed April 14, 1995.

**13.** *Motion for Partial Summary Judgment Regarding Antecedent Indebtedness (GPA),* Docket Entry 20, filed July 3, 1997, at page 1, footnote omitted.

(1) the transfer of a security interest on most of debtor's property during the preference period to secure the accrued "rent"; (2) payments made for rent and maintenance reserves during the preference period; and (3) the transfer of the security interest to cover maintenance obligations contained in the leases.

Both parties say that they only want a "conceptual resolution" of the § 547(b)(2) issue, but it is hard to talk about the numerous transfers in the abstract, even if it might not be necessary to have exact computations at this point. I requested each party identify the various types of transfers and present me with a sensitivity analysis concerning the potential damages under the antecedent debt issue. The figures they have provided belie the notion that GPA is only concerned with "rents that accrued."

The parties indicate that a decision in favor of GPA will wind up with it garnering most of the estate by virtue of its security agreement. GPA says this antecedent debt issue involves approximately $15 million [14] and the trustee says it is in excess of $50 million, more than the collateral will bear.[15] GPA has submitted a rough itemization of $15 million (actually, closer to $16.25 million) in damages as shown in the following verbatim summary by GPA: [16]

| Alternative Outcomes: Antecedent Debt | | |
|---|---|---|
| | TRANSFERS: | |
| Nonantecedent Debts: | Payments / C–Checks Made on Due Date | Security Agreement |
| Rents: | | |
| Incurred Pre-redelivery | $ 169,958 | $ 2,551,159 |
| Incurred Post-redelivery | n/a | $ 5,049.225 [1] |
| Maintenance Reserves: | | |
| Paid | | $ 553,262 |
| Unpaid | | $ 829,183 |
| C–Checks | $1,000,000 | $ 1,000,000 [2] |
| Tail Strike | | $ 250,0003 [3] |
| Redelivery Conditions: | | |
| Verified | | $ 3,288,089 [4] |
| Subject to Verification | | $ 2,745,139 |
| | $1,169,958 | $ 16,266,057 |

1: Estimated mitigate future rents
2: Trustee's numbers
3: Claim for uninsured portion of April 13, 1995 tail strike damages
4: Assumes Mx [[17]] reserves apply against redelivery claims, notwithstanding defaults, and that reserves were adequate

Clearly GPA is talking about more than post-petition rent, whether paid or unpaid.

The literal wording of GPA's motion does

14. *GPA Distributions: Alternative Outcomes (Preliminary)*, Docket Entry 141 filed June 3, 1999 (*see*, chart titled "GPA Distributions: Alternative Outcomes").

15. *Trustee's Explanation of Economic Impact of GPA's Antecedent Debt Argument*, Docket Entry 158, filed July 1, 1999.

16. *See, Antecedent Debt: Alternative Outcomes (Preliminary)*, [attached spreadsheet], Docket Entry 157, filed June 29, 1999, by GPA [Note: the spreadsheet is substantially duplicated below].

17. Mx = maintenance.

not request summary judgment on items other than "rents that have accrued," and $15 million surely exceeds any calculation of rent.

Quixotically, GPA's briefing seems to focus mainly on the issue of "current rent payments" under the long-term leases (i.e., rent and maintenance reserve payments made on the due date called for in the leases or a deferral agreement entered into between MarkAir and GPA), a matter involving only about $870,000.[18] Nonetheless, I will consider whether the security agreement is for antecedent debt with respect to all the items subsumed by GPA in the $15 million estimate of "antecedent debt," such as the relatively costly maintenance procedures (e.g., an FAA required maintenance procedure known as "C–Checks," generally costing $1 million).

The chapter 7 trustee has liquidated many of MarkAir's assets and has roughly $17.2 million on hand. Much of this (90% estimated by the trustee) is from the collateral described in the GPA security agreement. Thus, if GPA succeeds in its antecedent debt argument, its security interest will encumber a majority of the proceeds the trustee has to disburse.

3. *ISSUES*—The principal issues involved in the antecedent debt matter are:

- Is the security agreement encumbering substantially all of MarkAir's unencumbered assets, given within 90 days of bankruptcy to secure future rent (until the aircraft were returned to GPA), maintenance reserves and maintenance obligations called for in existing leases, a transfer for antecedent debt under § 547(b)(2) with respect to these items?

- Were the timely payments (under the deferral agreement and/or the original leases) for rent and maintenance reserves for "current rent" and not, therefore, antecedent debt under 11 USC § 547(b)(2)?

4. *LEGAL ANALYSIS*—

4.1. *Rent Payments Made and the Security Agreement Obtained Within 90 Days of Bankruptcy During the Preference Period Were Transfers for "Antecedent Debt" for the Purposes of § 547(b)(2)*— To establish a preference, the trustee must prove: [19]

- a transfer of an interest of the debtor in property to or for the benefit of a creditor;

- *for or on account of an antecedent debt owed by the debtor before such transfer was made;*

- made while the debtor was insolvent;

- made within a 90–day period before the bankruptcy was filed (or a longer period involving insiders); and,

- enabling the creditor to receive more than such creditor would have in a chapter 7 if the transfer had not been made.

Again, this *Memorandum* only concerns a threshold issue of whether the security interest granted to GPA in February 1995, was for antecedent debt pursuant to § 547(b)(2) with respect to aircraft lease obligations that accrued after the security interest (which was within 90 days of the bankruptcy). This might be called the "$15 million question"—i.e., the amount which GPA indicates the security agreement will garner from the proceeds of the trustee's liquidation if GPA prevails.

---

**18.** *See, Comparison of Date Due/Paid,* analysis by the trustee in the second and third columns from the right representing the amounts paid current under the original and deferral agreements (copy attached to *Proceeding Memorandum,* Docket Entry 53, filed May 28, 1998).

**19.** 11 USC § 547(b); *CHG International, Inc. v. Barclays Bank (Matter of CHG International,*

*al, Inc.),* 897 F.2d 1479, 1482 (9th Cir.1990), *abrogated on other grounds by Union Bank v. Wolas,* 502 U.S. 151, 112 S.Ct. 527, 116 L.Ed.2d 514 (1991); *Danning v. Bozek (In re Bullion Reserve of North America),* 836 F.2d 1214, 1219 (9th Cir.1988); and, *Wyle v. C.H. Rider & Family (In re United Energy Corp.),* 944 F.2d 589, 595 (9th Cir.1991).

GPA acknowledges that the security agreement was for antecedent debt with respect to past due rental and maintenance reserve payments.

Also, GPA wants to avoid having to give back some payments made within the 90 days, an amount that appears to have dwindled in the briefing and argument to about $870,000 (i.e., GPA is now arguing that only about $870,000 of about $3 million in payments is not antecedent debt). GPA argues, however, that the total of payments made for rent and maintenance reserves is covered by the security agreement in any event.

■ Although there is no definition of the phrase "antecedent debt" in the bankruptcy code,[20] in determining the meaning of the term in preference cases, the 9th Circuit Court of Appeals has indicated it is defined by the broad definition of the words "debt" and "claim" in the Bankruptcy Code. The code defines these terms as follows: [21]

In this title—

(5) "claim" means—

(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured; . . .

(12) "debt" means liability on a claim; . . .

One of the 9th Circuit cases addressing the meaning of "antecedent debt" under § 547(b)(2) is *In re Bullion Reserve.*[22] It involved a Ponzi scheme perpetrated by the debtor. The trustee sought to recover payments made by the debtor to the transferee, an investor in the scheme named Bozek, on the grounds of preference. One of Bozek's arguments is similar to the one made by GPA in this proceeding, that the transfers were not on account of antecedent debt as required by 11 U.S.C. § 547(b)(2). The court rejected the defense, saying:

2. Creditor and Antecedent Debt

Bozek contends he is not a creditor and that the transfer was not on account of an antecedent debt because BRNA did not owe him anything before making the bullion transfer. Bozek bases his argument on the idea that he never had a creditor's claim against BRNA because bullion was transferred to him upon demand and he did not suffer economic injury.

This argument ignores the Bankruptcy Code's broad definitions. A "creditor" is defined as an "entity that has a claim against the debtor." 11 U.S.C. § 101(9) (1982). "Claim" is defined as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(4) (1982). The legislative history of the Bankruptcy Code indicates that Congress intended to provide the broadest possible definition of "claim" when it enacted § 101(4). See H.R.Rep. No. 595, 95th Cong., 1st Sess. 309, reprinted in 1978 U.S.Code Cong. & Admin.News 5963, 6266; S.Rep. No. 989, 95th Cong.2d Sess. 21, reprinted in 1978 U.S.Code Cong. & Admin.News 5787, 5808; [citations omitted]

Under these definitions, it is clear that Bozek became a creditor when he transferred funds to BRNA for the purchase

---

20. *Upstairs Gallery, Inc. v. Macklowe West Development Co., L.P. (In re Upstairs Gallery, Inc.),* 167 B.R. 915, 917 (9th Cir. BAP 1994).

21. 11 USC §§ 101(5, 12) (1999).

22. *Danning v. Bozek (In re Bullion Reserve of North America),* 836 F.2d 1214 (9th Cir.1988).

of bullion. At that moment, Bozek accrued a right to demand bullion from BRNA. This right, although unmatured, constituted a "claim" under the Bankruptcy Code. [citation omitted][23]

Another 9th Circuit case bearing on the antecedent debt issue is *In re Futoran*.[24] The issue in that case was whether the debtor's payment of $290,000 to his ex-wife in cancellation of his obligations under a divorce settlement agreement to pay the ex-wife $6,000 per month until she remarried or either of them died was a transfer for an antecedent debt. The trustee sued the ex-wife to recover the $290,000 payment as a preference. One of the defenses was that the payment for the future obligation was not for antecedent debt under § 547(b)(2).

The court rejected the defense, stating that future child support may be "antecedent debt." It said:[25]

Cases that have considered the application § 547(b)(2) to the future obligations under an installment loan support this interpretation. They hold that debt is incurred when the loan is made and not when the payments become due. *See, e.g., In re Pippin*, 46 B.R. 281, 283 (Bankr.W.D.La.1984) ("the date on which a debtor executes a loan contract payable in installments, he also is and becomes legally bound to pay"); *In re Anders*, 20 B.R. 468, 469 (Bankr. M.D.Fla.1982) (same).

The husband became bound to make the monthly payments to the wife on January 1, 1987, more than three years prior to the transfer at issue. Although unmatured, the husband's future spousal support obligations were antecedent debt.

Similarly, the 9th Circuit case of *In re United Energy Corp.*[26] articulated the definition of "antecedent debt" under the fraudulent transfer statute, 11 USC § 548(a)(2). In Part 4.2.2 of this *Memorandum*, beginning at page 599–600, I suggest in some detail that "antecedent debt" was added to §§ 60a and 67d(1) of the Bankruptcy Act of 1898 at the same time by the 1938 Chandler Act, and the cases under the fraudulent transfer section may lend guidance to those under the preference section in trying to determine the meaning of "antecedent debt" in the latter. This carries over to the references to "antecedent debt" in the present analogs, 11 USC §§ 547(b)(2) and 548(d)(2)(A). Therefore, *United Energy* is instructive.

The court in *United Energy* found that payments to unwitting participants in a Ponzi scheme by a debtor were for antecedent debt, the debt being the transferees' rights of restitution against the debtor for its fraud. In reaching this conclusion, the court held:[27]

The legislative history of the Code evidences Congress' desire to provide an expansive definition of "claim" under section 101(4). See H.R.Rep. No. 595, 95th Cong., 1st Sess. 309 (1977), reprinted in 1978 U.S.Code Cong. & Admin.News 5963, 6266; S.Rep. No. 989, 95th Cong.2d Sess. 21–22, reprinted in 1978 U.S.Code Cong. & Admin.News 5787, 5807–08; see also *Pennsylvania Dep't of Pub. Welfare v. Davenport*, 495 U.S. 552, 556–58, 110 S.Ct. 2126, 2130, 109 L.Ed.2d 588 (1990); *Ohio v. Kovacs*, 469 U.S. 274, 279–80, 105 S.Ct. 705, 708, 83 L.Ed.2d 649 (1985); *Danning v. Bozek (In re Bullion Reserve of North America)*, 836 F.2d 1214, 1218 (9th Cir.), cert. denied, 486 U.S. 1056, 108 S.Ct.

---

**23.** *Danning v. Bozek (In re Bullion Reserve of North America)*, 836 F.2d at 1219.

**24.** *Futoran v. Rush (In re Futoran)*, 76 F.3d 265 (9th Cir.1996).

**25.** *Futoran v. Rush (In re Futoran)*, 76 F.3d at 267.

**26.** *Wyle v. C.H. Rider & Family (In re United Energy Corp.)*, 944 F.2d 589 (9th Cir.1991).

**27.** *Wyle v. C.H. Rider & Family (In re United Energy Corp.)* at 595.

2824, 100 L.Ed.2d 925 (1988). The term "debt" should be read as being coextensive with the term "claim", *Davenport,* 495 U.S. at 558, 110 S.Ct. at 2130. Thus, it is plain that Congress intended "debt" and, therefore, "antecedent debt," to be construed broadly. See *id.;* see also H.R.Rep. No. 595, 95th Cong. 1st Sess. 310, reprinted in 1978 U.S.Code Cong. & Admin.News 5963, 6267; S.Rep. No. 989, 95th Cong., 2d Sess. 23, reprinted in 1978 U.S.Code Cong. & Admin.News 5787, 5809.

GPA suggests that some language in *In re Superior Fast Freight, Inc.,* a 9th Circuit Bankruptcy Appellate Panel, case [28] implies that "antecedent debt" might not be as broad as the definition of a "claim," but that opinion is, of course, subordinated to the higher authority of the 9th Circuit Court of Appeals in the *Bullion Reserve, Futoran,* and *United Energy* opinions.

GPA acknowledges these cases, and seeks to distinguish them by citing many cases regarding "current rent" which are discussed in Part 4.2.5 of this *Memorandum.* It also cites several 9th Circuit cases which it suggests are controlling authority in analogous situations. I do not believe there is any controlling authority in the 9th Circuit on the "current rent" issue or with respect to executory contracts or lease.

GPA relies most heavily on *In re Gold Coast Seed Co.*[29] This was not a § 547(b)(2) case. The issue was whether the payment on a forward contract (a contract to buy a commodity at a future date, but at the price set on the earlier contract date) when the goods were delivered qualified for an ordinary course of business

exception under the older version of § 547(c)(2)(B). Section 547(c)(2), as originally enacted, was repealed in 1984,[30] but at the time, read [italics added]:

(c) The trustee may not avoid under this section a transfer—

(2) to the extent that such transfer was—

(A) in payment of a debt incurred in the ordinary course of business or financial affairs of the debtor and the transferee;

*(B) made not later than 45 days after such debt was incurred;*

(C) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(D) made according to ordinary business terms; . . .

The court in *Gold Coast* held that the "debt" was incurred when payment was due (when the goods were shipped) under the former ordinary course of business exception, not earlier when the contract was entered into. GPA argues that the determination of when a debt is incurred under former § 547(c)(2)(B), as analyzed by *Gold Coast,* should also apply by analogy to the treatment of its rent payments to MarkAir under § 547(b)(2).

I will discuss GPA's contention at greater length in Part 4.2.5 at page 48. In brief, I conclude that the issues under § 547(c)(2)(B) might call for a statutory construction of "debt" which differs from the definition of "antecedent debt" under § 547(b)(2). This might be necessary to avoid unintended or absurd results in applying § 547(c)(2)(B), and achieve what

**28.** *National Motor Freight Traffic Association, Inc. v. Superior Fast Freight, Inc. (In re Superior Fast Freight, Inc.),* 202 B.R. 485, 488 (9th Cir. BAP 1996), cited in Footnote 39 of GPA's opening brief, *Motion for Partial Summary Judgment Regarding Antecedent Indebtedness (GPA),* Docket Entry 20, filed July 3, 1997.

**29.** *Nolden v. Van Dyke Seed Co., Inc. (In re Gold Coast Seed Co.),* 751 F.2d 1118 (9th Cir.1985).

**30.** *CHG International, Inc. v. Barclays Bank (Matter of CHG International, Inc.),* 897 F.2d 1479, 1483 (9th Cir.1990), *abrogated on other grounds by Union Bank v. Wolas,* 502 U.S. 151, 112 S.Ct. 527, 116 L.Ed.2d 514 (1991); *Collier on Bankruptcy,* ¶ 547.04[2][b] (15th ed rev 1999).

Congress was apparently trying to do, provide protection for ordinary course of business payments on antecedent debts. Fortunately, since § 547(c)(2) was amended in 1984, the problem of interpretation of § 547(c)(2)(B) has been alleviated altogether.

One wonders, if the payment in *Gold Coast* was not for an antecedent debt for § 547(b)(2) purposes, why that was not raised to show that the trustee did not even have a *prima facie* case. In fact, the closest *Gold Coast* got to any consideration of § 547(b)(2) was indirectly in its reliance on *Iowa Premium Service Co.*,[31] itself a § 547(c)(2)(B) case.

*Iowa Premium Service* held that installment payments of interest on a promissory note were not incurred when the note was executed, but when the payments were due (a conclusion the 9th Circuit has later criticized[32]). *Iowa Premium Service* relied on *In re Mindy's, Inc.*,[33] a case which discusses both §§ 547(b)(2) and 547(c)(2)(B) in relation to "current rent." *Iowa Premium Service*, itself, does not address the § 547(b)(2) issue directly.

GPA also cites *In re Upstairs Gallery, Inc.*[34] in support of its position on "current rent." Suffice to say, *Upstairs Gallery*, while acknowledging some of the "current rent" cases cited by GPA (discussed in Part 4.2.5 at page 607–608), did not adopt them or need to since the facts were distinguishable in *Upstairs Gallery*. GPA's contention that the BAP approved the current rent cases cited is a misreading of the

opinion. The case is favorable to the trustee, not GPA. Even if it could be interpreted as an endorsement of GPA's "current rent" theory, it would be at best *dicta* by which I am not bound.[35]

GPA repeatedly emphasizes that the key question is "when was the debt incurred," as if the trustee doesn't get it.[36] This begs the question; it does not answer it. The trustee understands just as well as GPA that "when the debt was incurred" is the central question under § 547(b)(2). The parties' arguments can be summarized in a few words:

- the trustee generally argues it was incurred by using the broad definition of claim ("claim = debt"; "debt = antecedent debt"); and,
- GPA argues that the debt is incurred when payment is due ("antecedent debt = lease or executory contract payment due date").

To bolster its argument, GPA focuses on the slightly revised wording in § 547(b)(2) from the wording in § 60a of the Bankruptcy Act, suggesting that the additional words in § 547(b)(2) somehow support its position. The respective sections read as follows:

- § 60a provided stated in that respect: "... for or on account of an antecedent debt ..."
- § 547(b)(2) provides: "... for or on account of an antecedent debt *owed by the debtor before such transfer was made* ... " [italics added]

---

**31.** *Iowa Premium Service Co., Inc. v. First National Bank in St. Louis (In re Iowa Premium Service Co.)*, 695 F.2d 1109, 1111–12 (8th Cir.1982).

**32.** *CHG International, Inc. v. Barclays Bank (Matter of CHG International, Inc.)*, 897 F.2d 1479, 1482, 1486 (9th Cir.1990) *abrogated on other grounds by Union Bank v. Wolas*, 502 U.S. 151, 112 S.Ct. 527, 116 L.Ed.2d 514 (1991).

**33.** *Carmack v. Zell (In re Mindy's Inc.)*, 17 B.R. 177 (Bankr.S.D.Ohio 1982), analyzed in greater detail in Part 4.2.1.

**34.** *Upstairs Gallery, Inc. v. Macklowe West Development Co., L.P. (In re Upstairs Gallery, Inc.)*, 167 B.R. 915, 917 (9th Cir. BAP 1994).

**35.** *See, In re Kuraishi*, 237 B.R. 172, 175 (Bankr.C.D.Cal.1999).

**36.** *See, e.g., Reply Brief on Motion for Partial Summary Judgment Regarding Antecedent Indebtedness (GPA)*, at page 4, Docket Entry 39, filed January 23, 1998.

GPA argues the added words in § 547(b)(2), "owed by the debtor before such transfer was made," mean "when payment is due." No legislative history or case law supports this interpretation. The legislative history does show that in the final days before passage of the Bankruptcy Code of 1978 there were two versions of § 547(b)(2) proposed, one by the House and one by the Senate.[37]

The antecedent debt language in the Senate bill paralleled § 60a, but had some additional language exempting payment by the debtor of tax liabilities under the Senate's version of § 547(b)(2), regardless of their priority status. The House language without the reference to tax payments was adopted, instead, in the form of the existing § 547(b)(2). That language includes the phrase which is italicized, "... for or on account of an antecedent debt *owed by the debtor before such transfer was made* ..."

There is no indication in the legislative history that the italicized phrase represented a general modification to the preference law, or emphasized an existing doctrine. The language, instead, seems specifically geared to an issue regarding tax payments. The Senate Report for the rejected version of § 547(b)(2) stated:[38]

> Subsection (b)(2) of this section in effect exempts from the preference rules payments by the debtor of tax liabilities, regardless of their priority status.

A more complete statement is contained in a senate committee report of a hearing on S. 2266, in which a representative of the Treasury Department offered the following testimony:[39]

## PREFERENCES—SECTION 547

Traditionally, the bankruptcy laws have allowed the trustee to recover for the benefit of the estate certain amounts (known as voidable preferences) that the debtor paid over to creditors within four months before the case began, at a time when he was insolvent. Among the prerequisites for recovery, the trustee must show that the transfer was made in satisfaction of a so-called "antecedent debt," due and owing at the time of the transfer. The present bankruptcy statute does not define the term "antecedent debt," but in practice the preference provisions have rarely been applied so as to invalidate the payment of taxes made within four months of bankruptcy.

S. 2266 clarifies present law by providing a specific exception under the preference provisions for any debt required to be paid under the Internal Revenue Code-unlike the House bill, under which Federal tax deposits, voluntary tax payments (including estimated taxes), and levies could arguably be viewed as voidable preferences. Had the provisions of H.R. 8200, as so interpreted, been in effect during fiscal 1976, the Government would have been required to turn over to trustees in bankruptcy up to $258 million.

We believe that the preference provisions of S. 2266 resolve an issue too important to be left to judicial construction.

On the other hand, the House Report for the version of § 547(b)(2) which ultimately passed stated:[40]

> This provision will not apply to permit the trustee to recover estimated tax pay-

**37.** HRS 2266, 95th Congress, Second Session; *see,* Senate Report (Judiciary Committee), No. 95–989, at page 87, July 14, 1978.

**38.** Senate Report (Judiciary Committee), No. 95–989, at page 87, July 14, 1978 [to accompany HRS 2366].

**39.** Hearing on S. 2266—to Establish a Uniform Law on The Subject of Bankruptcies,

Tuesday, November 29, 1977, *Statement of Donald C. Lubick, Deputy Assistant Secretary for Tax Policy, U.S. Department of the Treasury.*

**40.** House Report (Judiciary Committee), No. 95–959, at page 373, September 8, 1977 [to accompany HR 8200].

ments by a debtor, because *no tax is due when the payments are made.* Therefore, *the tax on account of which the payment is made is not an antecedent debt.* [italics added]

The floor managers of bankruptcy legislation in the Senate and House, Senator DeConcini and Representative Edwards, noted that the Senate had compromised and accepted the House version.[41]

The House Report states that *estimated taxes* would not be treated as antecedent debt under its version of § 547(b)(2). This should not be interpreted as a general statement of legislative intent as to all types of debts that GPA can analogize to the rent payments in the present adversary proceeding. The date taxes are *incurred,* unlike other debts (such as rent), is specifically defined for preference purposes. Section 547(a)(4) provides:

[In this section] ... a debt for a tax is incurred on the day when such tax is last payable, including any extension, without penalty.

I conclude that the italicized wording in § 547(b)(2), "for or on account of an antecedent debt *owed by the debtor before such transfer was made,*" was inserted in the section solely in relation to the tax issue, and that it does not have the meaning GPA wants to ascribe to these words.

■ I also conclude, on the basis of *Bullion Reserve, Futoran, United Energy,* and *Upstairs Gallery,* that the transfers in payment and the security agreement to secure the rent, maintenance reserves, and maintenance obligations in the preexisting leases are for "antecedent debt."

The GPA leases were executed years before the February 1995, security agreement. They contain monthly rent and maintenance reserve obligations, and an obligation to return the aircraft to GPA with certain substantial periodic maintenance having been performed to exacting FAA standards. The monthly rental terms of the seven jets averaged about $185,000 per month.[42] The rental payments were not due until the month the aircraft was used. The maintenance reserve payments were due shortly after the month of usage based on such criteria as the number of hours operated or the number of takeoffs and landings.[43] Other maintenance obligations, including those due on the return of the aircraft (the return condition obligations) were called for in the existing leases. All these obligations, whether for current or future rent, maintenance reserves, or maintenance obligations, fit within the definition of "claim," and by analogy, to antecedent debt, under the 9th Circuit cases.

Courts in other circuits have held that periodic rental payments for possession of the property and payments approximately current with that possession is not antecedent debt. Often, these cases are not § 547(b)(2) cases, but cases under the pre–1984 version of § 547(c)(2)(B). I will discuss in Part 4.2 why I think the authorities upon which GPA relies are incorrect or distinguishable, as follows:

- 4.2.1.—Discussion of *In re Mindy's, Inc.,* and the cases from the early 1900's upon which it relies, to show the weakness of these cases;
- 4.2.2—Analysis of the legislative history of the preference law under the Bankruptcy Act of 1898, § 60a, to determine the origins of "antecedent debt" under the current law;
- 4.2.3.—Discussion of the New York cases cited by GPA holding that installment rent is incurred during the month of use to show that these cases are not controlling because they do not

41. *Described in Drabkin v. District of Columbia,* 824 F.2d 1102, 1109 fn. 26 (D.C.Cir. July 24, 1987).

42. *See, First Evidentiary Stipulation Between Trustee and GPA,* Exhibits A–1 to A–7, Docket

Entry 56, filed August 12, 1998, for copies of leases.

43. *Id.*

prime the Bankruptcy Code's expansive definitions of "claim" and "debt";

- 4.2.4.—Discussion of the treatment of leases under the 1978 Bankruptcy Code, to see how leases are treated by the Code in other contexts; and,

- 4.2.5.—Analysis of the cases under the 1978 Bankruptcy Code upon which GPA relies to distinguish them.

4.2. *Analysis of GPA's Authorities and History of Antecedent Debt Provision in Preference Law*—The following sections under Part 4.2 of this *Memorandum* make these points:

- The pre-Code cases relied on by GPA for the proposition that current rent is not for antecedent debt contain only cursory statements to that effect, but have been followed by many modern bankruptcy courts without sufficient analysis;

- The legislative history of § 60a of the Bankruptcy Act of 1898 which is the precursor of the current 11 U.S.C. § 547(b)(2), did not ascribe a definite meaning to the phrase "antecedent debt" when adopting the phrase in the Chandler Act, but the legislative history of § 67d infers that the reference to "antecedent debt" used in that section came from the Uniform Fraudulent Conveyance Act of 1918, and the meaning was probably intended to be similar in both sections;

- A U.S. District Court in Now York, in deciding whether a creditor has a "debt" for future rent under the New York fraudulent transfer statute (similar to 11 U.S.C. § 548(d)(2)(A) and § 67d(1) of the Act) held that a debtor-creditor relationship is created for future rent obligations;

- The Bankruptcy Code recognizes a lessor of real estate may have a "claim" for future rent under 11 U.S.C. § 502(b)(6);

- The Bankruptcy Code's expansive definitions of "claim" and "debt" preempts GPA's argument that the court must look solely to cases interpreting the state law of New York which hold that a preexisting lease with monthly installments does not create a debtor-creditor relationship at its inception, but only when the current rent payments are due; and,

- While GPA cites authority under the Code, only a few are actually § 547(b)(2) cases, and those that adopt the "antecedent debt" argument of GPA too facilely accept the older case authority as gospel, without giving enough attention to the changes wrought by the Bankruptcy Code of 1978.

4.2.1. *The Pre–Code Cases Cited by GPA and In re Mindy's Do Not Hold Up*—In the beginning there was *Mindy's*.[44] It is cited dozens of times in GPA's briefing, in which it croons, a-la Barry Manilow:[45] "How happy you made me, oh *Mindy's*." To which, I must sing the refrain: "But I sent you away, oh *Mindy's*."

*In re Mindy's* said:[46]

The Court declines to follow the rationale advanced by the trustee that the debt was incurred at the time of the original signing of the lease obligations. The total lease obligation, at that point in time, was not due and payable—it was only due and payable as the lease term progressed and as the lessee occupied the premises subject to the leasehold in accordance with the terms of the lease. Contrary to the suggestion of the trustee, this situation is not analogous to payments on a long-term unsecured note obligation. An unexpired lease on real estate is treated as an executory contract under the Bankruptcy Code (11 U.S.C. § 365), a recognition of the prin-

---

44. *Carmack v. Zell (In re Mindy's, Inc.),* 17 B.R. 177 (Bankr.S.D.Ohio 1982).

45. *See, Mandy* by Barry Manilow.

46. *Carmack v. Zell (In re Mindy's, Inc.),* 17 B.R. at 179.

ciple that such lease involves an exchange of rights and obligations by the parties to the lease throughout its term. The concept of adequate assurance of future performance under a lease is separately provided for in the Bankruptcy Code because, unlike the payee on a long-term note obligation who merely accepts periodic payments from a payor, a lessor (or lessee in rarer circumstances) continues to supply to a lessee performance under the lease and, as rent is paid, continues to provide to the lessee the benefit of an ongoing leasehold estate.

Historically, the payment of current rent has been held to rest upon current consideration and thus did not constitute a preference under previous bankruptcy law. See *In re Barrett*, 6 Am.Bank.Rep. 199 (S.D.N.Y.1901); *In re Lange*, 97 F. 197 (S.D.N.Y.1899); *Matter of Louis J. Bergdoll Motor Co.*, 35 Am.Bank.Rep. 32, 225 F. 87 (E.D.Pa.1915); and *In re Bowles*, 14 Am.Bank.Rep. (N.S.) 133 (E.D.Neb.1928). While there has been some suggestion that current Bankruptcy Code provisions may in some manner alter the result reached in these cases (See Kaye, *Preferences Under the New Bankruptcy Code*, 54 Am.Bank.L.J. 197 at 204 n. 11 (Summer, 1980)), this Court concludes that the present Bankruptcy Code neither mandates nor sanctions such a result. See 4 Collier on Bankruptcy (15 Ed.) P 547.20 n. 20.

The citation to *Barrett, Lange, Louis J. Bergdoll Motor Co.*, and *Bowles*, appears to have had its genesis in a footnote in a previous edition of *Collier on Bankruptcy* for the proposition that "... current payments of rent may be said to rest on a present consideration," stating in the associated footnote 20: [47]

20  See In re Barrett (Ref., N.Y.), 6 Am.B.R. 199; Matter of Bowles (Ref., Neb.), 14 Am.B.R. (N.S.) 133. See also discussion in Matter of Louis J. Bergdoll Motor Co. (D.C.Pa.), 35 Am.B.R. 32, 225 Fed. 87. But even the payment of current rent may not be used as a device to effect a preference. *In re Lange*, 97 Fed. 197 (S.D.N.Y.1899).

Note the difference in the question we have in the GPA case—when was debt incurred—not whether there was current consideration. Nonetheless, the loose citation of the *Barrett* string of cases by *Mindy's* and by some other courts [48] has been the source of many of the cases upon which GPA relies.[49] *Mindy's* is a weak foundation for these cases because *Barrett, Lange, Louis J. Bergdoll Motor Co.*, and *Bowles* are not substantial, well-reasoned authority.

The issue in *Mindy's* was whether payment of current rent was entitled to an ordinary course of business exception under § 547(c)(2), as it existed before an amendment in 1984. The court noted that four of the five elements of § 547(b) had been met, that there was a question about whether the trustee had established the antecedent debt element, and that the singular "disputed issue is whether or not the payments made by the trustee were on account of antecedent debt and whether the 45 day 'ordinary course of business' exception should apply to bar the trustee's recovery." [50]

It is uncertain that the court ever ruled on the § 547(b)(2) issue *per se*, and the wording of the opinion belies a conclusion that it did. For example, the citation to the *American Bankruptcy Law Review*

---

**47.**  3 (Part 2) *Collier on Bankruptcy*, ¶ 60.19, page 853 and fn 20 (14th ed rev 1988).

**48.**  *See, e.g., Zelman v. Esher (Matter of Mersick & Co.)*, 1 B.R. 599, 601 (Bankr.D.Conn.1979) (a case under § 60a of the Bankruptcy Act of 1898, as amended).

**49.**  *See*, cases cited by GPA in *Table of Antecedent Debt Cases (GPA)*, Docket Entry 47, filed April 14, 1998.

**50.**  *Carmack v. Zell (In re Mindy's, Inc.)*, 17 B.R. at 178.

article [51] with which the judge in *Mindy's* disagreed was a discussion of § 547(c)(2), not the antecedent debt section, § 547(b)(2).

But, assuming that *Mindy's* did rule that current rent installments on a long-term lease are not antecedent debt under § 547(b)(2), I would have ruled exactly the opposite based on the expanded definition of "claim" and "debt" under the 1978 Code for the reasons stated in Part 4.1 of this *Memorandum*, and, also, because of the weakness of the authority cited by *Mindy's*.

Yet, as GPA notes, *Mindy's* begat many cases [52] which cite it favorably, sometimes in *dicta* and often, where the parties conceded that the § 547(b)(2) antecedent debt element had been satisfied by the trustee, in a discussion of the application of the old § 547(c)(2) 45–day rule for an ordinary course of business exception to a preference claim. I will discuss these cases in Part 4.2.5 of this *Memorandum*.

Few, if any, of these cases concerned the amount of money—$15 million plus—involved in this proceeding. This warrants a deeper look at the pre-Code cases relied on by *Mindy's* with respect to antecedent debt, *In re Barrett,*[53] *In re Lange,*[54] *Matter of Louis J. Bergdoll Motor Co.,*[55] and *In re Bowles.*[56] These cases are not a strong foundation to determine that installment rent is not antecedent debt under § 547(b)(2). The entire "current rent" doctrine in these cases rest on a 200–word statement in *Barrett,* a 1901 referee's opinion, unsupported by authority.

These cases are, at best, cursory authority to GPA's passionate evocation that they represent some chiseled-in-stone doctrine supporting its position on the meaning GPA ascribes to "antecedent debt."

*In re Barrett* is a two-page opinion by a referee in bankruptcy. It involved a written lease with rent due in installments. Several installments were made within four months of the bankruptcy, but the case does not inform us of the due dates. At that time, a preference was governed by § 60a of the Bankruptcy Act of 1898. The referee held as the first reason for denying a preference (these are the 200 words supporting *Mindy's* ):

> The first is that a claim for rent payable in instalments under the usual forms of lease constitute several ·and independent transactions whenever each instalment of rent becomes due, so that upon payment of each instalment of rent the transaction between debtor and creditor or landlord and tenant is absolutely closed; and this particularly so, because of the legal rights and position of the landlord, who has the constant security of a return to him of possession of his freehold estate in case of default in payment by the instituting of summary proceedings for the possession of his property in. case of such non-payment of rent; the transaction being

---

**51.** Kaye, *Preferences Under the New Bankruptcy Code,* 54 AmBankLJ 197 at 204 n 11 (Summer 1980).

**52.** *Thomas W. Garland, Inc. v. Nooney Co. (In re Thomas W. Garland, Inc.),* 28 B.R. 87, 89 (Bankr.E.D.Mo.1983); *Child World, Inc. v. Service Merchandise Co., Inc. (In re Child World, Inc.),* 173 B.R. 473, 476 (Bankr. S.D.N.Y.1994); *Brown v. Morton (In re Workboats Northwest, Inc.),* 201 B.R. 563, 567 (Bankr.W.D.Wash.1996); *Sapir v. Eli Haddad Corp. (In re Coco),* 67 B.R. 365, 370–371 (Bankr.S.D.N.Y.1986); *Bernstein v. RJL Leasing (In re White River Corp.),* 799 F.2d 631 (10th Cir.1986); and *Armstrong v. General Growth Development Corp. (In re Clothes, Inc.),* 45 B.R. 419, 421 (Bankr.D.N.D.1984); *see,* these and other cases cited in *Table of Antecedent Debt Cases (GPA),* Docket Entry 47, filed April 14, 1998.

**53.** *In re Barrett,* 6 AmBankRep 199 (SDNY1901).

**54.** *In re Lange,* 3 AmBankRep 231, 97 F. 197 (S.D.N.Y.1899).

**55.** *Matter of Louis J. Bergdoll Motor Co.,* 35 AmBankRep 32, 225 F. 87 (E.D.Pa.1915).

**56.** *In re Bowles,* 14 AmBankRep (N.S.) 133 (EDNeb1928).

closed upon the payment of rent at its maturity, a new liability distinct and separate from the old arises and the acceptance of payment by the landlord without a guilty knowledge, as in this case, is not the acceptance of a preference, because there is not that transfer of property or payment on account which is the foundation of the decision of the United States Supreme Court in the case of *Carson, Pirie, Scott & Co.,* supra. [Note, the *Pirie*[57] case has nothing to do with rental payments, current or otherwise]

The referee stated, as a stronger grounds for denying a claim of preference, that the transfer would not have resulted in the creditor getting more than another creditor in the same class because, apparently, the referee felt the rent creditor was in a separate class by himself. The court cited the reference statute as it existed in 1901:

> "Preferred Creditors—(a) A person shall be deemed to have given a preference if, being insolvent, he has procured or suffered a judgment to be entered against himself in favor of any person or made a transfer of any of his property, and the effect of the enforcement of such judgment or transfer will be to enable any one of his creditors to obtain a greater percentage of his debt than *any other of such creditors of the same class.*" [emphasis in opinion]

The statute in effect in 1901 did not mention "antecedent" debt *per se,* and was much looser than the current preference section, § 547(b). Further, there is no authority cited for the portion of the referee's opinion regarding "current rent." One would think, if the current rent rule was such a sacrosanct doctrine, the authority supporting it would be much stronger and based upon a more thorough analysis than found in this 98–year–old referee's opinion.

*In re Bowles* is even more obscure as authority for the cases cited by GPA in support of its position. It is also a referee's opinion. The bankruptcy and his landlord had entered into a five-year lease in 1925, with monthly rent of $225 per month. The lease provided that furniture and fixtures were collateral for the rent. The lease was not recorded until February 4, 1927, five days before an involuntary bankruptcy was filed. The landlord claimed a security interest was filed. At that time, the debtor owed $929.18 in back rent (most of it accrued before February 4, 1927), but the furniture and fixtures were sufficient to cover that claim, if they were allowed as collateral for a secured claim.

The language used by the referee is almost diametrically opposed to GPA's position regarding the payment of current installment rent. The referee, *not discussing installment rent for current possession, but analyzing whether a lien for future rent would survive a preference attack,* held: [58]

> The demise of a leasehold estate constitutes a consideration for the lessee's undertaking to pay rent. Corpus Juris, volume 35, Section 397, p. 1145. The transfer was not one to secure a preexisting debt at the time the transfer was made. The lease created an obligation on the part of the lessee to pay rental in installments from month to month during the term of the lease, subject to the happening of the contingencies which would operate to relieve the tenant from payment of installments of rental thereunder, that is eviction by title paramount or by acts of the lessor, destruction or disrepair of the premises, the quitting of the premises by the lessee with the lessor's consent, or the assignment by the lessee of his term with the approval of the lessor so as to relieve the lessee from further obligation upon the lease. *Matter of Roth & Appel,* 181

**57.** *Pirie v. Chicago Title & Trust Co.,* 182 U.S. 438, 21 S.Ct. 906, 45 L.Ed. 1171 (1901).

**58.** *In re Bowles* at 139.

F. 667 (C.C.A. 2nd Cir.1910), 24 Am. B.R. 588, 181 F. 667. There was, therefore, a present consideration at the time of the execution of the lease, subject to be defeated in part by the contingencies hereinbefore stated, which would operate to relieve the tenant from payment of the rent. None of the contingencies happened, the tenant (now bankrupt) occupying the premises until the appointment of a receiver. A transfer for a present or future consideration cannot be a voidable preference. (Collier on Bankruptcy, 13th Edition, volume 2, p. 1278, and authorities cited).

In simple terms, this language says the rent obligation was incurred when the lease was signed. It does not directly address current rent (and to the extent it does, it seems to take a position contrary to that in *In re Barrett*). *In re Bowles* does not support *Mindy's* or GPA's "current rent" analysis.

The 1899 *In re Lange* opinion covers less than a page. A petition was filed against a debtor, lessee of a bakery, averring a preference in the payment of rent. No details are given. The court said: "Payment of rent by an insolvent is not necessarily a preference. But when it is done as a means and for the purpose of carrying on a business in fraud of creditors, it should be so regarded." *Lange* discusses none of the issues central to GPA's antecedent debt motion.

In *Matter of Louis J. Bergdoll Motor Co.*, a 1915 opinion, the district judge adopted a referee's opinion *verbatim*. The referee offset against a priority rent claim of $11,700 by the landlord, the payment by the debtor of back rent totaling $1,500, which was made within four months of bankruptcy. Since the $1,500 was not for "current rent," but applied to back rent, the court affirmed the referee's decision that there was a preference.

The referee suggested that, had the rent been for current months, it would not have been a preference based on a *classification* analysis. That is, the decision did not turn on an antecedent debt issue. Rather, it dealt with a concept similar to the current § 547(b)(5) (that a creditor not receive a greater distribution by the transfer than it would have been entitled to under a chapter 7) as it is applied to a fully secured creditor.

While the referee's opinion in *Bergdoll* noted that the creditor, in seeking to defend against the preference, had cited *In re Barrett* in support of its position, the referee did not appear to have based his opinion on the portion of the *Barrett* opinion involving payment of current rent being payment on a current account. Rather, he appears to base the decision on the second holding in *Barrett* that the landlord was in a special class, so that payment did not prefer him to the general unsecured creditors. The referee cited, "as regards current rent," [59] the *Belknap* case, [60] also from the Eastern District of Pennsylvania.

The *Belknap* case involved distress for rent, back rent at that. *Belknap* held: [61]

> ... the effect of the distress did not enable the landlord to obtain a greater percentage of his debt than any other creditor of the same class. There is no other creditor of the same class, for there is but a single landlord; and, as the claim for rent had priority over the claims of the general creditors, the distress did not enable the landlord to obtain a greater percentage of his debt.

Antecedent debt was not addressed in *Belknap*.

The logic of *Bergdoll* is garbled. The referee did hold the if the payment had been for "current rent" it would not have been preferential, but since it was for back

---

59. *Matter of Louis J. Bergdoll Motor Co.*, 225 F. at 89.

60. *In re Belknap*, 129 F. 646 (E.D.Pa.1904).

61. *In re Belknap*, 129 F. at 648.

rent it was.[62] While this may have been a reference back to *Barrett*, the structure of the opinion belies such an interpretation. Even if it was, the referee in *Bergdoll* offers no independent analysis of the concept of current versus antecedent rent, but merely cites the referee in *Barrett*.

In short, of all the pre-Code cases cited by *Mindy's* in support of its antecedent debt analysis, only a paragraph, unsupported by authority, in a 1901 referee's opinion discusses GPA's "current rent" theory in the context of GPA's argument to this court.

This occurred at a time when there were no statutory exceptions to the harsh wording to § 60a of the Bankruptcy Act. Judicial exceptions thus popped up to ameliorate harsh cases, like the "current rent" situation.[63] The 1978 Bankruptcy Code has alleviated the need to rely on such judge-made modifications of the bankruptcy statutes in the preference area.[64]

Since the old cases cited by *Mindy's* appear to be weak support for its conclusion about antecedent debt, a review of the preference law under the Bankruptcy Act of 1898 may help in pinning down the historical basis of the current § 547(b)(2).

4.2.2. *A Search for the Meaning of "Antecedent Debt" in the Preference Law Before 1978*—Section 547(b)(2) was fashioned in part after § 60a of the Bankruptcy Act of 1898, as amended by the Chandler Act in 1938, so a review of that pre-Code law and legislative history should be considered.

Before the 1938 Chandler Act,[65] the preference section of the Bankruptcy Act of 1898, § 60a read:[66]

SEC. 60. [11 U.S.C. § 96] PREFERRED CREDITORS.—a. A person shall be deemed to have given a preference if, being insolvent, he has, within four months before the filing of the petition, or after the filing of the petition and before the adjudication, procured or suffered a judgment to be entered against himself in favor of any person, or made a transfer to [of] any of his property, and the effect of the enforcement of such judgment or transfer will be to enable any one of his creditors to obtain a greater percentage of his debt than any other of such creditors of the same class. Where the preference consists in a transfer, such period of four months shall not expire until four months after the date of recording or registering of the transfer, if by law such recording or registering is required or permitted.

After the Chandler Act, § 60a (as amended through 1978) read:[67]

SEC. 60. PREFERRED CREDITORS.

a. (1) A preference is a transfer, as defined in this Act, of any of the property of a debtor to or for the benefit of a creditor *for or on account of an antecedent debt,* made or suffered by such debtor while insolvent and within four months before the filing by or against him of the petition initiating a proceeding under this Act, the effect of which transfer will be to enable such creditor to obtain a greater percentage of his

---

**62.** *Matter of Louis J. Bergdoll Motor Co.*, 225 F. at 89.

**63.** *See, e.g.,* 3 (Part 2) *Collier on Bankruptcy,* ¶ 60.19 at page 851–853 and ¶ 60.23, *Cash Transactions; Current Expenses; Payments on Account* (14th ed rev 1988).

**64.** *See,* Part 4.1 of this *Memorandum.*

**65.** Act of June 22, 1938, ch. 575, 52 Stat. 855.

**66.** A copy of the Bankruptcy Act of 1898, as amended prior to enactment of the Chandler Act, can be found in 10 *Collier on Bankruptcy, Appendix,* page 1783 (14th ed rev 1988).

**67.** A copy of the Bankruptcy Act of 1898, as amended up to the date of enactment of the Bankruptcy Code of 1978 can be found in Appendix A *Collier on Bankruptcy,* AppPt 3(a), *The Bankruptcy Act of 1898,* Ch 6, Sec 60 (15th ed rev 1999).

debt than some other creditor of the same class. [italics added]

I have been unable to locate any authority discussing the reason for using the "antecedent debt" language in § 60a. Academics, including the widely respected Vern Countryman [68] and Thomas Ward and Jay Shulman ("[t]he phrase appears to be almost self-explanatory" [69]), in discussing the history of the current preference section, § 547(b), do not proffer a special meaning to the "antecedent debt" language under the current law or its predecessor in § 60a. The term "antecedent debt" has been used in many pre-Chandler Act cases, mostly in relation to fraudulent transfers, but often enough relating to preferences.[70]

Garrard Glenn, a widely quoted expert who actively wrote treatises on preference law in the 1930s and 1940s, offers the following analysis of antecedent debt under the Chandler Act version of § 60a:

> And here we may take up the point that was left loose in previous pages.[71] When the Bankruptcy Act speaks of an "antecedent debt", it does not mean that the debt must have matured before the date of the transfer which is under question. What it means is an "antecedent debt" that has originated before the transfer, by virtue of a previous transaction. A transfer, therefore may well be preferential although the obligation it is intended to secure has not yet fallen due, and this is illustrated by the case of principal and surety which we have under discussion. The principal's obli-

gation of reimbursement (as distinct from exoneration) cannot arise until the guaranteed debt is due and the surety pays it. Until that happens, the surety has no provable claim against the principal's estate; but to margin an unmatured claim with security can be preferential, as these cases show.[72]

The legislative history of the Chandler Act states that one of its purposes was "[t]o clarify certain of the definitions and to add desirable new definitions ..." [73] If "antecedent debt" was intended to create some new initiative in the preference field, the legislative history would have surely noted it. The fact that it did not, infers that the addition of the word "antecedent" did not signify a dramatic change to preference law by its inclusion.

In describing the reason for the change to § 60a, the House Report indicates the concern was with the portion of § 60a akin to § 547(b)(5), the "greater proportion" test. The report gives as the reason for the Chandler Act amendment to § 60a: [74]

> *(a) Definition of preference.*
>
> Present section 60a: The language of the present law is cumbersome, and the definition of a preference is not a scientific one. If literally construed, the percentage test may be restricted to the situation existing at the time the transfer is made. Some courts have, in fact, adopted such literal construction. However, the preferential nature of the transfer should be tested rather by the ultimate result, which is the view taken by other courts. The conflict has re-

**68.** Countryman, *The Concept of Voidable Preference in Bankruptcy*, 38 VandLR 713, 724 and fn 83 (May 1985).

**69.** Ward and Shulman, *In Defense of the Bankruptcy Code's Radical Integration of the Preference Rules Affecting Commercial Financing*, 81 WashULQ 1, 19–26 (quote at 19) (Spring 1983).

**70.** See, e.g., *In re Davidson*, 109 F. 882, 883 (S.D.Iowa 1901).

**71.** Garrard Glenn, 2 *Fraudulent Conveyances and Preferences*, § 398, page 684, "For or on

*Account of Antecedent Debt"* (Baker, Voorhis & Co. 1940).

**72.** Garrard Glenn, 2 *Fraudulent Conveyances and Preferences*, at § 459, at page 777.

**73.** HR Rep. No. 1409, 75th Congress, 1st Sess, page 3, *Purposes of Bill (Revision of the National Bankruptcy Act)* (July 29, 1937).

**74.** HR Rep. No. 1409, 75th Congress, 1st Sess, at page 30.

cently been settled by the Supreme Court in the case of *Palmer Clay Products Co. v. Brown*, [297 U.S. 227, 56 S.Ct. 450, 80 L.Ed. 655] (1936) in favor of the retrospective construction. It is therefore deemed advisable to eliminate the overlapping, discard the present cumbersome phrasing, and state the law more accurately, scientifically, and comprehensively. Section 60a as recast accomplishes this desirable result. The new test is more comprehensive and accords with the contemplated purpose of striking down secret liens. It is provided that the transfer shall be deemed to have been made when it has become so far perfected that neither a bona-fide purchaser nor creditor could thereafter have acquired rights superior to those of the transferee. As thus drafted, it includes a failure to record and any other ground which could be asserted by a bona-fide purchaser or a creditor of the transferor, as against the transferee. A provision also has been added which makes the test effective even though the transfer may never have actually become perfected.

The Chandler Act added the words "antecedent debt" not only to § 60a dealing with preferences, but to § 67d(1) related to fraudulent transfers.[75] The amendment to § 67d(1, 2) provided that certain transfers made by a debtor within four months of bankruptcy for a consideration which was inadequate or not "fair consideration" were avoidable as preferential.

Section 67(d)(1) defined a "fair" consideration for fraudulent transfer purposes to include the satisfaction of an antecedent debt:

d. (1) For the purposes of, and exclusively applicable to this subdivision d: ...; and (e) consideration given for the property or obligation of a debtor is

"fair" (1) when, in good faith, in exchange and as a fair equivalent therefor, property is transferred or an *antecedent debt* is satisfied, or (2) when such property or obligation is received in good faith to secure a present advance or *antecedent debt* in an amount not disproportionately small as compared with the value of the property or obligation obtained. [italics added]

The legislative history indicates that much of the Chandler Act revision to the fraudulent transfer section, § 67d(1, 2), was to bring the federal statute in alignment with the Uniform Fraudulent Transfer Act and applicable state law.[76]

Section 67d copied almost verbatim substantial portions of the Uniform Fraudulent Conveyance Act of 1918. The UFCA had a section defining "fair consideration" which refers to "antecedent debt:" [77]

§ 3.   Fair Consideration.

Fair consideration is given for property, or obligation,

(a) When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or

(b) When such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, or obligation obtained.

Another addition to the fraudulent conveyance definition section in the Chandler Act was a more expansive definition of "creditor" as applied to § 67d exclusively:

d.   (1) For the purposes of, and exclusively applicable to this subdivision d: ... (b) "debt" is any legal liability, whether matured or unmatured, liquidated or unliquidated, absolute, fixed, or

---

**75.** *Id.* at page 92; *see, also,* § 67 as amended in 1938, reproduced in Vol A Appendix *Collier on Bankruptcy*, Part 3(a), Ch VII, Sec 67 (15th ed rev 1999).

**76.** *Id.* at page 32.

**77.** *Uniform Fraudulent Conveyance Act of 1918*, ULA, § 3.

contingent; (c) "creditor" is a person in whose favor a debt exists; . . .

This was also an adoption of the language of the UFCA of 1918.[78] Note that this definition of "debt" is much closer to the definitions found in the current Bankruptcy Code's expansive definitions of "debt," "claim," and "creditor," [79] than the definition of "debt" which applied to preferences under § 60. The definition of "debt" applicable generally to the Act, including § 60a, was much more anemic:

> The words and phrases used in this Act and in proceedings pursuant hereto shall, unless the same be inconsistent with the context, be construed as follows: . . .
>
> (14) "Debt" shall include any debt, demand, or claim provable in bankruptcy; . . . [80]

Also, "creditor" was generally defined as:

> (11) "Creditor" shall include anyone who owns a debt, demand, or claim provable in bankruptcy, and may include his duly authorized agent, attorney, or proxy; . . . [81]

The import of this statutory analysis is to suggest that in determining what "antecedent debt" means under § 547(b)(2) there is guidance in analyzing the Chandler Act changes in § 67d(1), with its expanded definition of "debt" and "creditor." It seems likely that the use of the "antecedent debt" language in § 60a was a drafting afterthought in the overall modification by the Chandler Act of §§ 60, 67,

and related sections of the Bankruptcy Act of 1898.

*Sunrise Industrial Joint Venture*,[82] a recent opinion by the U.S. District Court from the Southern District of New York, illustrates the significance of this history to refute GPA's position that the hoary old cases cited in *In re Mindy's*[83] should be adopted regarding the "current rent" issue. *Sunrise Industrial Joint Venture* involved a suit by a landlord to avoid a fraudulent transfer by its tenant. The landlord sued the tenant and its parent company. One of the defenses was that the landlord was not a "creditor" as defined by New York law, and that there was no "debt" for such rent under New York fraudulent transfer law [84]—a statute having a definition of "creditor" and "debt" similar to the UFCA and § 67d(1) definitions I have just described.

The court distinguished *In re Ryan's Estate*[85] relied on by the defendants in *Sunrise Industrial Joint Venture* and by GPA in the present proceeding, and said: [86]

> The defendants contend that under New York law, a covenant to pay rent does not create a debtor-creditor relationship between a tenant and a landlord. In support of this proposition, the defendants rely on *In re Ryan's Estate*, . . ., and other cases relying on the authority of *Ryan's Estate*.
>
> \* \* \* \* \* \*
>
> . . . In particular, the court held [in *Ryans's Estate*]:
>
> > The covenant to pay rent creates no debt until the time stipulated for the

**78.** *Uniform Fraudulent Conveyance Act of 1918*, ULA, § 1.

**79.** 11 U.S.C. §§ 101(5, 10, 12).

**80.** § 1(14) of the Bankruptcy Act of 1898, as amended.

**81.** § 1(11) of the Bankruptcy Act of 1898, as amended.

**82.** *Sunrise Industrial Joint Venture v. Ditric Optics, Inc.*, 873 F.Supp. 765 (E.D.N.Y.1995).

**83.** *See*, analysis of *In re Barrett, In re Lange, Matter of Louis J. Bergdoll Motor Co.*, and *In re Bowles* in Part 4.2.1.

**84.** NY McKinney's Debtor and Creditor Law, § 270.

**85.** *In re Ryan's Estate*, 294 N.Y. 85, 95, 60 N.E.2d 817 (1945).

**86.** *Sunrise Industrial Joint Venture v. Ditric Optics, Inc.*, 873 F.Supp. at 771–72.

payment \*\*\* It is not a case of a debt complete when contracted, but of which the performance cannot be required till some future period. On the contrary, the obligation upon the rent is altogether contingent.

In the Court's view, the defendants' have misunderstood the definition of "creditor" and "debt" under the New York fraudulent conveyance statute, as well as the applicability of *Ryan's Estate* to those definitions. The defendants would have the Court rule that a person is not a creditor, or an obligation is not a debt, under the fraudulent conveyance statute until the claim of the creditor actually accrues; that is, until the debt becomes due and owing. That, however, is contrary to the definition of the terms creditor and debt in the statute. Those terms are defined to include contingent and unmatured claims or liabilities.

\*      \*      \*      \*      \*      \*

Indeed, *Ryan's Estate* undermines the defendants' contentions, because there the New York Court of Appeals held that rent was a "contingent obligation." Thus, although for the purposes of the law of trusts future rent may not be considered a "debt", for the purposes of the fraudulent conveyance statute it can be.

Moreover, the Court finds that the other cases relied upon by the defendants are inapposite. None of them deals with the issue of rent as a contingent debt or liability within the context of New York's fraudulent conveyance statute. [citations and emphasis omitted]

Although *Sunrise Industrial Joint Venture* concerns the fraudulent conveyance law of New York, and not federal preference law, it is instructive about how a New York federal court should interpret a similar preference claim involving the claim that future rent does not create a debtor-creditor situation such that it would be "antecedent debt" under § 547(b)(2). I realize that some New York bankruptcy courts have suggested otherwise, and I will discuss these cases in Part 4.2.5.

4.2.3. *Cases Cited by GPA Regarding New York State Law About When Current Rent Debt Accrues and the Old Bankruptcy Cases Dealing With Provability Are Not Persuasive*—GPA contends the court must follow state law, the law of New York in this case, in determining whether current rent payments are payments for antecedent debt. This argument ignores the primacy of bankruptcy law where Congress does choose to address a subject, such as the definition of "debt" and "claim" under §§ 101(5, 12).

GPA cites cases, such as *In re Roth & Appel, O.L. Schwencke Land & Investment Co. v. Forster, Ryan's Estate,* and *Standard Oil of New Jersey,* to support the proposition that current rent for current possession is not on account of antecedent debt.[87] Most of these cases relate only to the "current rent" question, and not whether a transfer like GPA's security agreement covers the big ticket kind of damages GPA seeks, like return condition damages.

GPA has conceded in its briefing and argument that if payment was even a day late, it was for antecedent debt.[88] While some of the payments were made timely under the original leases or the deferral agreement (only about $870,000 at this point), these payments are not saved from being "for antecedent debt" by the New York cases cited by GPA.

*Sunrise Industrial Joint Venture*[89] adequately refutes GPA's arguments sup-

---

**87.** *In re Roth & Appel,* 181 F. 667, 669 (2nd Cir.1910); *In re Ryan's Estate,* 294 N.Y. 85, 95, 60 N.E.2d 817, 821 (1945); *O.L. Schwencke Land & Investment Co. v. Forster,* 171 N.Y.S. 140, 142 (N.Y.Sup.App.Term 1918); and *Standard Oil Co. of New Jersey v. Elliott,* 80 F.2d 158, 159 (4th Cir.1935).

**88.** *See, Sapir v. Eli Haddad Corp. (In re Coco),* 67 B.R. 365, 370 (Bankr.S.D.N.Y.1986).

**89.** *Sunrise Industrial Joint Venture v. Ditric Optics, Inc.,* 873 F.Supp. 765, 771–72 (E.D.N.Y.1995), discussed in Part 4.2.2 of this *Memorandum.*

ported by these cases, especially *Ryan's Estate. Sunrise Industrial* adopts an analysis similar to that espoused by the trustee in this proceeding. The trustee contends that the correct way to interpret § 547(b)(2) is to give an expansive definition to "claim" and "debt" to bring almost any obligation into its ambit, and let the transferee in a preference action, such as GPA, establish its defenses under § 547(c).

Some of the other cases cited by GPA, such as the 1910 case of *In re Roth & Appel,* and the 1918 case of *O.L. Schwencke Land & Investment Co. v Forster,* involve issues of provability of a lessor-creditor's claim. Under the 1898 Bankruptcy Act, a claim which otherwise was valid was not allowed to participate in dividends if it was not provable.[90]

The provability concept was deleted from the 1978 Bankruptcy Code. Indeed, a lessor of land to a debtor may have a claim for damages for loss of future rent.[91] Rent claims for personal property leases, by analogy, are clearly allowable under the present Bankruptcy Code.[92] If the issues presented in these cases had been presented under the Bankruptcy Code of 1978, any bankruptcy or appellate court would hold that a claim based on a preexisting lease for future rent is allowable to the extent the statute permits.

*Standard Oil of New Jersey*[93] is a 1935 case dealing with offsets and lack of mutuality and not a preference issue. While each of the cases cited by GPA about when a debt for rent accrues under New York law may be read in the abstract to support GPA's position, it is difficult to say why these old cases (all pre-Chandler Act, in fact) should govern the interpretation of antecedent debt with respect to current rent under § 547(b)(2).

■ While state law is often important in determining rights and duties under the Bankruptcy Code, the Code sometimes trumps state law,[94] including with respect to the definition of "antecedent debt."[95] For example, the 9th Circuit has held that, even if state law allows *full* attorney fees where a contract provides for them, a specific bankruptcy code section addressing that issue limits them to *reasonable* attorney fees as part of a secured claim. In other words, federal law, in that case, preempted state law.[96]

Likewise, the definition sections of §§ 101(5, 12) defining "claims" and "debt" preempt the narrow definition proposed by GPA.

4.2.4. *The Fact That a Lease is Involved is Not Adequate Grounds to Hold That GPA's Security Agreement Was Not for Antecedent Debt* —GPA has argued repeatedly that the distinction in the cases it cites for its position is that they involve leases or executory contracts governed by § 365 of the Bankruptcy Code, whereas the trustee's cases generally involve secured transactions.[97] The fact that GPA

---

**90.** 4 *Collier on Bankruptcy,* ¶ 502 LH[1][b], "Eradication of the Concept of Provability" (15th ed rev 1999); *Upstairs Gallery, Inc. v. Macklowe West Development Co., L.P. (In re Upstairs Gallery, Inc.),* 167 B.R. 915, 917 (9th Cir. BAP 1994).

**91.** 11 USC § 502(b)(6).

**92.** *See,* 11 USC § 502(b)(6) relating to real estate leases.

**93.** *Standard Oil Co. of New Jersey v. Elliott,* 80 F.2d 158 (4th Cir.1935).

**94.** *Board of County Commissioners of Sedgwick County, Kansas v. Coleman American Properties, Inc. (In re American Properties,* *Inc.),* 30 B.R. 247, 249 (Bankr.D.Kan.1983), citing *New York v. New York, N.H. & Hartford R.R.,* 344 U.S. 293, 73 S.Ct. 299, 97 L.Ed. 333 (1953).

**95.** *UIC, Inc. v. Plaintiff Comm. of Creditors (In re Powerine Oil Co.),* 126 B.R. 790, 793 (9th Cir. BAP 1991).

**96.** *Joseph F. Sanson Inv. Co. v. 268 Ltd. (Matter of 268 Ltd.),* 789 F.2d 674, 675 (9th Cir. 1986).

**97.** *See, e.g., Reply Brief on Motion for Partial Summary Judgment Regarding Antecedent Indebtedness (GPA),* at pages 10–58, Docket Entry 39, filed January 23, 1998.

was a lessor is not sufficient grounds under the current law to require a determination that the security agreement or the current rent payments were not for antecedent debt under § 547(b)(2).

An analysis of the historical distinction between leases and other debtor-creditor relationships appears in the legislative history to the 1978 Bankruptcy Code in relation to the cap on real estate rent claims proposed by § 502(b)(6). Although related to real estate, the comments appear apropos to all leases. The legislative history relates: [98]

[3]—History of Section 502(b)(6).

[a]—History of Claims of Landlords Under the 1898 Act as Amended.

While from a strictly logical point of view there should be no need or justification to treat leases differently from other bilateral contracts, the development of a landlord's rights arising from the bankruptcy of a tenant led to so many deviations from the general law applicable to contractual rights in bankruptcy that leases of real estate were for many years considered to be *sui generis*. As originally enacted, the Bankruptcy Act of 1898 contained no express provision for the provability of claims of landlords for rent which might accrue in the future. It was held that rent to accrue after the filing of the bankruptcy petition was incapable of proof as it was not a fixed liability absolutely owing but rather a demand contingent upon the occurrence of certain events. Although courts had recognized and admitted to proof in bankruptcy cases contingent claims and claims for anticipatory breach, rent owing a landlord was not similarly treated, for the courts consistently stopped short of extending the same liberality of view to claims based on breach of leases of real estate. In 1934, Congress made efforts to enact

detailed provisions for both bankruptcy liquidation and reorganization proceedings in terms of conferring on future rent the status of a provable debt susceptible of liquidation.

Thus, from the time of the Chandler Act in 1938, the bankruptcy statutes started to treat lease payments in the context of bankruptcy like other prepetition claims. The cases decided under the 1978 Bankruptcy Code, which are cited by GPA holding that current rent payments on an existing lease are not antecedent debt under § 547(b)(2), fail to coordinate with the change in the law since 1938.

4.2.5. *Analysis of Cases Cited by GPA Relating to § 547(b)(2) and Repealed § 547(c)(2)(B)*—GPA cites a number of cases in support of its antecedent debt argument, at least as it applied to "current rent," an issue that appears to involve only about $870,000. It cites few, if any, cases and offers little analysis showing why the security agreement was not a transfer for antecedent debt with respect to claims based on the future maintenance charges, a significant proportion of the $15 million GPA claim. There is no discussion as to why future maintenance obligations (such as the "return condition" obligations) debt should be governed by cases dwelling on a "current rent" analysis.

GPA's cases do not stand up to the trustee's arguments about how the 1978 Bankruptcy Code should treat the rent payments to GPA claims as they relate to § 547(b)(2). The Supreme Court in *Union Bank v. Wolas*[99] implied that the 1978 Code provided a new framework for dealing with preferences, breaking with the judge-made exceptions to alleviate an inadequate § 60a of the Bankruptcy Act. The legislative history supports this, indicating § 547, in general, was a substantial departure to the treatment of preferences under the old law.[100]

---

**98.** 3 *Collier on Bankruptcy*, ¶ 502[3][a] LH (15th ed 1999).

**99.** *Union Bank v. Wolas*, 502 U.S. 151, 112 S.Ct. 527, 532, 116 L.Ed.2d 514 (1991).

**100.** Senate Report (Judiciary Committee), No. 95–989, at page 87, July 14, 1978 [to accom-

GPA can be amply protected from injustice by reference to the § 547(c) exceptions, without resorting to the distortion of the core definitions of what a "claim" is and when it arises.

I will discuss the principal cases cited by GPA, and indicate why I think they are wrong or not persuasive.

*IN RE MINDY'S, INC.*—I have already addressed *In re Mindy's, Inc.* in Part 4.2.1 of this *Memorandum.*

*IN RE THOMAS W. GARLAND, INC.* [101]—This was a bankruptcy court decision, which held that rent paid within 90 days of the bankruptcy under a preexisting lease was not subject to a preference recovery. The court noted that both the majority and minority in a case from the court's own 8th Circuit, *Iowa Premium Service Co.*[102] had relied on *In re Mindy's, Inc.* to say that a rent payment is not incurred until the due date, not the date of the lease. The majority in *Iowa Premium Service Co.* went so far as to say that interest payments on a long-term debt were not for antecedent debt, a view disavowed by the 9th Circuit as noted in previous discussion at page 16. The discussion in *Garland* is terse and none of the underlying issues are analyzed.

*IN RE CHILD WORLD*[103]—This case involved an issue of when a payment by check for rent occurred—when it was tendered or when it cleared? The parties and the court *agreed* that monthly rent paid on the due date was not antecedent debt, so this was not a litigated issue. But, the court nonetheless stated its reasons for agreeing:

Here, the parties have stipulated for purposes of this motion that four out of the five elements of the preference algorithm are satisfied. They differ however on the second element, that is, whether the rental payments were made on account of antecedent debt. The parties do not dispute the fact that the debt at issue was incurred on February 1, 1992. Indeed, it is well settled that the obligation to pay rent is deemed to arise on the due dates provided in the lease and not when the lease is signed. *Bernstein v. RJL Leasing (In re White River Corp.)*, 799 F.2d 631 (10th Cir.1986) (citing *In re Mindy's, Inc.*, 17 B.R. 177 (Bankr.S.D.Ohio 1982)); *In re Upstairs Gallery, Inc.*, 167 B.R. 915, 918 (9th Cir. BAP 1994) (citing *Coco.*, 67 B.R. at 370); accord M. Bienenstock, *Bankruptcy Reorganization* at 369 n. 59 (1987) (for ease of reference, Bienenstock at 369) (citing other cases).[104]

Both *In re Coco* and *In re Upstairs Gallery* were cases in which current periodic rent payments were not made, so whether they were antecedent debt was *not* the issue. In expressing their opinions about "current rent" they may be viewed as *dicta*. In addition, *Upstairs Gallery* did not endorse the current rent theory, but merely commented upon it. I will discuss *Coco* and *Upstairs Gallery* later. Likewise, I will discuss *In re White River Corp.*, which was a § 547(c)(2) case, not a § 547(b)(2) case, below.

*IN RE WORKBOATS NORTHWEST, INC.*[105]—This case involved the payments for lease of a business premises. Although

pany HRS 2366] and House Report (Judiciary Committee), No. 95–959, at page 372, September 8, 1977 [to accompany HR 8200].

101. *Thomas W. Garland, Inc. v. Nooney Co. (In re Thomas W. Garland, Inc.)*, 28 B.R. 87 (Bankr.E.D.Mo.1983).

102. *Iowa Premium Service Co., Inc. v. First National Bank in St. Louis (In re Iowa Premium Service Co.)*, 695 F.2d 1109 (8th Cir.1982), discussed in Part 4.1 at page ——.

103. *Child World, Inc. v. Service Merchandise Co., Inc. (In re Child World, Inc.)*, 173 B.R. 473 (Bankr.S.D.N.Y.1994).

104. *Id.* at 476–477.

105. *Brown v. Morton (In re Workboats Northwest, Inc.)*, 201 B.R. 563, 567 (Bankr. W.D.Wash.1996).

there had been a written lease, it eventually was not extended. The debtor, however, continued to occupy and pay rent.

This case involves a "subsequent new value" issue under § 547(c)(4)—whether a subsequent rent delinquency by debtor may be treated as "new value" under that section.

The court found that the prior lease had terminated already, so the rent debt did not arise from the written lease. An issue arose whether the debtor's continued possession was "new value" to the estate. In analyzing this, the court alluded to *In re Mindy's, Inc.,* holding that leases are executory contracts [106] and that the obligation to pay rent accrued periodically, but not in the same type of factual or legal setting as *Mindy's. Workboats* is simply not close enough to the facts and issues involved in the GPA situation to offer it much support on the § 547(b)(2) question.

*IN RE WHITE RIVER CORP.*—[107]The parties in *In re White River Corp.* stipulated that all the elements of § 547(b) had been met, so whether there was an antecedent debt pursuant to § 547(b)(2) was not an issue. Rather the court ruled on the basis of the former version of § 547(c)(2) (the 45–day, ordinary course exception). At the time, the section read [italics added]:

(c) The trustee may not avoid under this section a transfer—

(2) to the extent that such transfer was—

(A) in payment of a debt incurred in the ordinary course of business or financial affairs of the debtor and the transferee;

*(B) made not later than 45 days after such debt was incurred;*

(C) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(D) made according to ordinary business terms; ...

*White River* cited the *In re Mindy's, Inc.* reasoning with respect to § 547(c)(2)(B), and held that rent on a preexisting equipment lease was not incurred when the lease was entered into, but on the actual date the rent was due. Other courts have also cited cases decided under § 547(b)(2) as authority in deciding cases involving the former § 547(c)(2)(B), some of which are discussed in this part of this *Memorandum.*

The question in the present adversary proceeding is, if a narrow definition of when a debt is "incurred" for § 547(c)(2)(B) purposes is used, why should a broad one be used for § 547(b)(2)?

▪ Luckily, § 547(c)(2) was amended in 1984 to alleviate the problem. Now the ordinary course of business exception only requires a defendant to show a transfer is in payment of a debt incurred in the ordinary course of the business or financial affairs of the debtor and transferee, and according to ordinary business terms. The current § 547(c)(2) does not focus on *when* the debt was incurred.

Had the problem with the initial wording not been alleviated, it would have been a situation where giving a literal effect to the words of the statute would have lead to an unintended, absurd or impracticable result.[108] If "debt" in § 547(c)(2) were to be given the expansive reading, it would have virtually abrogated the exception to a preference intended to be granted. In such a case, the use of "debt" in § 547(c)(2)(B) could be treated as payment obligations coming up in the ordinary course of busi-

**106.** 11 USC § 365.

**107.** *Bernstein v. RJL Leasing (In re White River Corp.),* 799 F.2d 631 (10th Cir.1986).

**108.** *United States v. Missouri Pac. R.R.,* 278 U.S. 269, 278, 49 S.Ct. 133, 136, 73 L.Ed. 322 (1929); *Seattle–First National Bank v. Conaway,* 98 F.3d 1195, 1197 (9th Cir.1996).

ness, and not as defined in §§ 101(5, 12), as discussed in Part 4.1.

The Supreme Court has before given differing meanings to the same words, even in the same section of the Bankruptcy Code.[109] This would have been another place to apply the same type of reasoning—interpreting "debt" differently in § 547(b)(2) and § 547(c)(2)(B).

Many of GPA's cases interpreting the legislative intent of the repealed § 547(c)(2)(B) appear to have used an analysis or rationalization similar to *Mindy's*, but, in fact, treated the meaning of "antecedent debt" differently in § 547(b)(2) than the meaning under § 547(c)(2)(B). This may explain why, in so many of the cases, the parties did not contest, or the court found, that the element of § 547(b)(2) has been satisfied. Logically, the same argument under § 547(b)(2) should have applied, if that is what *Mindy's* held, but the litigants seem to have understood that the legal issues under § 547(c)(2) were sufficiently different so that the existence of "antecedent debt" under § 547(b)(2) was not contested.

Reliance on GPA's § 547(c)(2) cases to determine the § 547(b)(2) issue in the present case is an unwarranted stretch in light of the different statutory purposes of each section.

*IN RE CLOTHES, INC.*[110]—This case involved the lease of a retail premises. The issue was whether several checks paid on October 8, 1980, and November 6, 1980, each cashed about five days later, qualified as an ordinary course of business payment under the former § 547(c)(2).

The court held that the elements of § 547(b)(2) had been satisfied. In sustaining the § 547(c)(2)(B) argument, the court referred to *Mindy's, Barrett, Matter of Louis J. Bergdoll Motor Co.,* and *Bowles,* all discussed in Part 4.2.1 of this *Memorandum.* I have just discussed § 547(c)(2)(B) previously in connection with the *White River* case.

*IN RE COCO*[111]—The court said that the case did not involve "current rent" for the premises involved, but if it had it would have held that the antecedent debt element of a preference case, § 547(b)(2), had not been satisfied. So, it is *dicta.*

The court gave its reasons for its *dicta,* citing the familiar litany of cases: *In re Mindy's, Inc., In re Barrett, In re Lange, Matter of Louis J. Bergdoll Motor Co., In re White River Corp., In re Clothes, Inc.,* and *In re Garland,* all of which I have discussed.

*IN RE UPSTAIRS GALLERY, INC.*[112]—This is a 9th Circuit Bankruptcy Appellate Panel opinion. The debtor had paid $38,000 to its landlord within 90 days of the debtor's chapter 11 bankruptcy in order to cancel the balance of a long-term written lease. The debtor brought a preference action to recover the $38,000.

The landlord claimed the payment was not for antecedent debt because it settled the future rent obligation of the debtor, apparently relying on bankruptcy court decisions from the Southern District of New York, *In re Coco* and *In re Pan Trading, Inc.*[113] The court indicated that settling a future rent obligation in a termination agreement was not the same as paying current rent during a current peri-

**109.** *Dewsnup v. Timm,* 502 U.S. 410, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992).

**110.** *Armstrong v. General Growth Development Corp. (In re Clothes, Inc.),* 45 B.R. 419, 421 (Bankr.D.N.D.1984).

**111.** *Sapir v. Eli Haddad Corp. (In re Coco),* 67 B.R. 365, 370–371 (Bankr.S.D.N.Y.1986); *Bernstein v. RJL Leasing (In re White River Corp.),* 799 F.2d 631 (10th Cir.1986).

**112.** *Upstairs Gallery, Inc. v. Macklowe West Development Co., L.P. (In re Upstairs Gallery, Inc.),* 167 B.R. 915, 918 (9th Cir. BAP 1994).

**113.** *Fisher v. New York City Dept. of Housing Preservation and Dev. (In re Pan Trading, Inc.),* 125 B.R. 869, 875 (Bankr.S.D.N.Y.1991).

od. The payment to settle the claims was for antecedent debt. This sounds similar to GPA taking a security interest to secure future lease obligations.

While the court acknowledged without criticism, but without specifically endorsing, the concept of "current rent" doctrine described in *Coco* and *Pan Trading*, it said that the BAP case did not involve current rent. In fact, the tenor of the opinion seems more favorable to the trustee's position that a debt is incurred under a lease when it is first entered into.

There was an argument of the landlord that the debt really accrued at the time of the termination agreement and not the initial lease. The court disagreed, saying:

> We hold that the debt in the instant case was incurred on April 29, 1988 [the date of the lease]. A contract which is unambiguous in its terms on which the parties have agreed governs the relationship between the parties. A later compromise of the claim does not affect the time when the debt first arose.

Although the substance of the termination agreement between Macklowe and Upstairs dealt with the termination of a lease agreement and cancellation of future liability thereunder, the agreement is analogous to a compromise or settlement agreement.

As of April 29, 1988, Macklowe had a claim for monthly rental payments and Upstairs had a liability relating to that claim, or in other words, a debt. This debt arose before the November 20, 1990, termination of lease agreement, and was therefore chronologically antecedent. Consequently, a common sense reading of § 547(b)(2) would indicate that the $38,532.36 settlement of the lease liability made on November 20, 1990, was for or on account of an ante-

cedent debt owed by the debtor before such transfer was made.

This supports the trustee, not GPA.

5. *CONCLUSION:*—GPA argues that 9th Circuit case law [114] is controlling, but can cite me no case on point in this circuit holding for its position that periodic rent payments made on the date due are not antecedent debt.

The more recent bankruptcy cases cited by GPA to support its position are not based on a solid foundation and ignore changes made by the Bankruptcy Code in the definitions of claim and debt. They appear to follow the pre-Code cases by habit rather than reason.

I will adopt the straightforward resolution of the trustee, outlined in Part 4.1 of this *Memorandum*, which results in my concluding that the rent and maintenance reserve payments made, and the security agreement granted, are for antecedent debt incurred under the long-term leases well before the 90–day preference period.

Because of the decision I have made, I have not addressed other arguments made by the trustee.

This *Memorandum* is a much expanded explanation of my previous oral ruling. The parties are working on an agreed form of order for entry.

---

**114.** *Nolden v. Van Dyke Seed Co., Inc. (In re Gold Coast Seed Co.),* 751 F.2d 1118 (9th Cir.1985); *Upstairs Gallery, Inc. v. Macklowe West Development Co., L.P. (In re Upstairs Gallery, Inc.),* 167 B.R. 915, 917 (9th Cir. BAP 1994); *Brown v. Morton (In re Workboats Northwest, Inc.),* 201 B.R. 563, 567 (Bankr. W.D.Wash.1996).